Crandon v. Insurance Co.

No. 20,665.

R. C. CRANDON and W. W. CRANDON, Partners, etc., *Appellees,*
v. THE HOME INSURANCE COMPANY OF NEW YORK, *Appellant.*

SYLLABUS BY THE COURT.

1. FIRE INSURANCE—*Merchandise—"Fireproof Safe" Clause—Provision Valid.* Where a fire insurance policy covering a business building and a stock of merchandise contains a clause reciting that the assured agrees to make an annual inventory and to keep a set of books showing a complete record of the business transacted, including purchases, sales and shipments, and that such inventory and books shall be securely locked in a fireproof safe at night and at all times when the store is not open for business, and that on a failure to produce such inventory and books for the inspection of the company the policy "shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon," a failure to keep such inventory and books in a fireproof safe at night whereby they are destroyed by fire will ordinarily bar a recovery on the insurance policy.

2. SAME—*"Fireproof Safe" Clause—Waiver.* Where a fire loss occurs under the circumstances suggested in syllabus 1, the insurance company does not waive the "fireproof safe" clause by inviting the assured to meet defendant's adjuster in a town ten miles away for the purpose of settlement, nor by offering to pay 50 per cent of the loss notwithstanding the breach of the "fireproof safe" clause of the policy, nor by retaining the entire premium which had been paid to insure both the store building and the merchandise, there being no dispute about the insurance company's liability for the insurance on the building.

3. APPEAL—*Technical Points Disregarded.* Technical objections not affecting substantial rights examined and overruled under section 581 of the civil code.

Appeal from Neosho district court; JAMES W. FINLEY, judge. Opinion filed February 10, 1917. Reversed.

*M. A. Fyke,* and *E. L. Snider,* both of Kansas City, Mo., for the appellant.

*W. R. Cline,* and *J. Q. Stratton,* both of Erie, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs obtained judgment against the defendant for the face value of a fire insurance policy covering their business building and its contents. The defendant appeals, admitting its liability on the building but complaining of the judgment as to its liability on the personalty.

The pleadings and the plaintiffs' evidence develop the facts: The plaintiffs, father and son, were partners in a mercantile business in South Mound, in Neosho county. The defendant issued to them a fire insurance policy in two items, $1200 on their business building and $2000 on their stock of merchandise. By the terms of the insurance policy the assured agreed to take an annual inventory and to keep a set of books showing a complete record of business transacted, including all purchases and sales for cash and credit, and further recited:

"Warranty to Keep Books and Inventories and to Produce them in Case of Loss.

"The following covenant and warranty is hereby made a part of this policy. . . .

"3d. The assured will keep such books and inventory, and also the last preceding inventory, if such has been taken, securely locked in a fire-proof safe at night, and at all times when the building mentioned in this policy is not actually open for business; or failing in this, the assured will keep such books and inventories in some place not exposed to a fire which would destroy the aforesaid building.

"In the event of failure to produce such set of books and inventories for the inspection of this Company, this Policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon."

The plaintiffs' building and merchandise were burned in the nighttime and they notified the insurance company. The adjuster arrived at South Mound about ten days after the fire. He ascertained that the inventory and books had not been kept in the safe as the policy provided and that they had been destroyed by the fire. Crandon, sr., was absent from home. The adjuster talked with the son, who testified:

"Q. Did he at that time make any offer of settlement of the loss? A. Well, he said that he didn't owe us anything only for the building."

Crandon, sr., testified:

"He (the adjuster) come out to South Mound. I was not at home but learned he was there and he left word for me to meet him at Parsons

the next morning which I did. My son, who was my partner, accompanied me to Parsons. We met Mr. Fort (the adjuster) at the Matthewson house hotel.

"Q. Did you then talk over the loss and the circumstances of it? A. I think so, yes, sir.

"Q. Was the matter of the manner in which you had kept your books discussed at the time? A. I think it was.

"Q. Were the invoices that you had taken at your last invoice also burned up in the building? A. They were.

"Q. These invoices and your books were not kept in the iron safe? A. No, sir.

"Q. Did you talk that all over with Mr. Fort at that time . . . ? State what was done and what was said in substance as nearly as you can . . . What offer of payment or settlement, if any, the adjuster of the company, 'Mr. Fort, made to you and your son at that time and place? A. He offered to make a settlement for $2200.

. . . . . . . . . . .

"Q. What did he say, if anything, Doctor, about the custom of the company to pay one-half? A. He said that he did not consider the company owed me anything only what the building was insured for, $1200, but in order to make a settlement he would give me $2200 for the total loss and I declined to accept that.

"Q. If anything was said at the time, Doctor, with regard to you and your son being willing to make, and offered to procure from the wholesale houses invoices to supply him with the information? A. He said that he did not care anything about those."

The son testified:

" Q. Did you afterwards meet the adjuster in Parsons? A. Yes, sir; the next day.

"Q. Who accompanied you to Parsons? A. My father.

. . . . . . . . . . .

"Q. At that time, what if anything, did he say to you about adjusting the loss, or about any payment that he was willing to make? A. He said he really did not owe us anything but for the building, but he would give us 50% of the insurance on the stock, which insurance on the building and the stock he offered us $2200 and there was $3200.

. . . . . . . . . . .

"Q. At that time and prior to that time had you talked over the fact with him that the policy of insurance was burned up and that the invoices were also burned up? A. Yes, sir.

"Q. And had you prior to that time talked over the fact that the books and the invoices were not kept in an iron safe? A. We told him that they were not in there because they were burned up.

"Q. He knew all that? A. He certainly did.

"Q. Did you have any conversation with him at that time about procuring from the wholesale houses duplicate invoices? What was said on

that subject? A. I told him we could get them and he said he was not asking for them.

· "Q. Is that the last time you saw the adjuster with regard to any settlement? A. Yes, sir."

The above are the main features of the plaintiffs' evidence. No evidence was offered by the defendant.

The defendant contended below and contends here that its liability was limited to the sum for which the building was insured and that it was altogether relieved from liability for the loss of the merchandise under the terms of the policy and the plaintiffs' evidence. Counsel for the plaintiffs argue that the failure to keep the inventory and books of the business so that the insurance company could definitely ascertain the amount of the plaintiffs' loss, according to the terms of the policy, was waived by the defendant's adjuster by the following acts and omissions on his part: (a) Notwithstanding he was informed when he came to South Mound that the inventory and books had not been kept in an iron safe he arranged to meet them next day at Parsons for the purpose of adjusting the loss; (b) His offer to pay $1000 of the insurance on the merchandise; and (c) The company's retention of the unearned portion of the premium on the insurance policy.

Neither of these nor all of them together can fairly be said to amount to a waiver. The son, who was a partner, was informed by the defendant's adjuster on the latter's first arrival in South Mound that the company denied liability on the merchandise. The father being absent, it was but natural and proper that the adjuster should wish to make an appointment with him for the next day. At their meeting next day the adjuster dealt with the plaintiffs frankly, and clearly informed them of the company's nonliability for the loss of the merchandise, but offered to pay them $1000 thereon notwithstanding it was not liable under the policy. It is elementary that a person may voluntarily offer to settle and pay a part of a demand without prejudicing his position if the demand afterwards becomes the subject of a judicial controversy. Touching any unearned portion of the premium, if the plaintiffs are entitled thereto, that matter was also covered by the policy. It reads in part: "Upon demand of the assured the unearned premium . . . shall be returned." It does not appear that any demand

for the return of any unearned portion of the premium was made, and aside from the clause just quoted, the policy does not seem to contemplate a return of unearned premium. Moreover the consideration was an entirety covering the building as well as the merchandise, and since it admits its readiness to pay the loss on the building it should not now be required to return any part of the consideration.

We find nothing in this case which even approaches a waiver of the plain and positive terms of the insurance contract touching the necessity that the inventories and books showing the state of the business should be kept in a fireproof safe so that they would be forthcoming for the inspection of the company if a fire loss was claimed on the merchandise. Disregard of this precautionary stipulation to keep the inventories and books of the business in a fireproof safe or otherwise so that they will not be destroyed by fire and so that the insurance company may verify the loss and avoid being imposed on by overinsurance defeats recovery. (*Insurance Co. v. Knerr*, 72 Kan. 385, 83 Pac 611; *Insurance Co. v. Stahl*, 72 Kan. 578, 83 Pac. 614; *Hammond v. Insurance Co.*, 92 Kan. 851, 142 Pac. 936; *Joffe v. Niagara Fire Ins. Co.*, 116 Md. 155, and cases cited; 19 Cyc. 761-764. See, also, citations in Note, 28 L. R. A., n. s., 338.)

Cases where the conduct of the insurance company was held to waive its policy clauses requiring inventories and books to be kept in fireproof safes and the like have been cited by the plaintiffs, but none of them rest on such shadowy grounds as are urged to support a waiver in the case at bar.

In *Joffe v. Niagara Fire Ins. Co.*, supra, it was said:

"When there is no question about . . . the loss having been without the fault or negligence of the owner, courts naturally shrink from placing such an interpretation on a clause of this kind as will deprive the owner of a right to recover, by reason of a purely technical defense, if that can be properly avoided, but even then when the terms of the contract are clear and unambiguous, courts have no right to make new contracts for the parties, or ignore those already made by them simply to avoid seeming hardships. A review of the many decisions on this Iron Safe Clause will show a tendency in some instances to do more for the protection of the insured than they seemed ready to do for themselves, although the clause has been very generally recognized as valid and reasonable, and has been declared to be useful and desirable, not simply for the insurer but for the honest insured." (p. 160.)

Some minor technical questions raised by the plaintiffs hardly need discussion. In a case so simple as the foregoing it would not do to dismiss the appeal because the abstract does not refer to the pages of the transcript. The attorney's certificate at the conclusion of the abstract is sufficient. The transcript was completed on December 7, 1915, within seventeen days after judgment in the court below. Counsel for the defendant neglected to file it with the clerk of the district court as required by section 574 of the civil code until December 23, 1916, when their attention was called to the matter in plaintiffs' brief. The abstract had been served upon counsel for the plaintiffs several months earlier, and it was filed in this court on April 18, 1916. It is not contended that the abstract is not sufficiently complete for the purpose of review and an examination of the transcript discloses no discrepancy, nor can we discern how the belated filing of the transcript in this case prejudiced the plaintiffs in the slightest degree. It might well be otherwise if there was disputed testimony or any controversy over the facts. But we are bound to heed the admonitions of section 581 of the code which enjoins us to disregard technical errors which do not prejudicially affect substantial rights.

The cause is reversed and remanded with instructions to modify the judgment, and to reduce it to the sum of $1200.